UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN HAMM,

                    Plaintiff,             Case Number 22-11456

v.                                     Honorable David M. Lawson

PULLMAN SST, INC.,

                    Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Kevin Hamm, a bi-sexual male who works in the construction industry, brought this case against his former employer for discrimination due to a hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 and its state law counterpart. After discovery closed, the defendant moved for summary judgment of dismissal on all counts. The Court heard oral argument on March 6, 2025. Because the plaintiff has not offered evidence to create fact questions on all the elements of his claims, the motion will be granted, and the case will be dismissed.

I.

Kevin Hamm was hired by defendant Pullman's construction manager, Chad Ruff, in October 2020. Ruff assigned Hamm to work on a renovation project at the landmark Michigan Central Station in Detroit, Michigan, where Hamm was a shotcrete/gunite nozzleman, reporting to superintendent Brian Martinus. The plaintiff's employment was covered by a collective bargaining agreement with Laborer's Union, Local 499. When he was hired, the plaintiff received and acknowledged a copy of Pullman's anti-harassment policy, which included a complaint procedure.

Hamm alleges that in November 2020, he was engaged in idle workplace conversation with co-worker Josh Perez, and after discussing the possible sexual orientation of an employee of another firm, Hamm told Perez that he was bi-sexual.  Kevin Hamm dep., ECF No. 22-5, PageID.354.  Hamm says that following that revelation, Perez later told him that he "reminded [him] of Kevin Bacon, the gay faggot that was chopped up for being a faggot." *Id.* at PageID.355. (Note: The reference evidently is to a Michigan man who was murdered in a sexual-orientation-related hate crime in 2019; no relation to the famous actor by the same name.).

For the next six months, from November 2020 through April 2021, several of the plaintiff's co-workers made disparaging remarks based on the plaintiff's sexual orientation.  Multiple times in November through January, Perez called the plaintiff a "faggot" while walking past him on the job site.  *Id.* at PageID.357.  In late November 2020, a couple of days after the revelatory conversation with Perez, co-worker Kyle Flaler coughed and said "faggot" when the plaintiff walked past him on the job site.  *Ibid.*  In late December or early January, a group of co-workers including Perez asked the plaintiff if he had "jacked off in his car" during a lunch break.  *Id.* at PageID.358.  In January 2021, another co-worker, Brian Martinus, told the plaintiff to "quit being a pussy" and "quit being a fag" after the plaintiff paused while operating a concrete applicator because his neck was sore.  *Id.* at 356.  Several times from January through April 2021, Martinus called the plaintiff a "faggot" when walking past him.  *Id.* at 359-60.  Another time in January, after the plaintiff went to get water during a work break, Martins asked him if he was "into . . . dick in your mouth."  *Id.* at PageID.361.  On an unspecified date in January, when the plaintiff walked out to his car after work, the phrase "fuck Kevin" was hand-lettered in a layer of pollen deposited on his car.  *Ibid.*  In March 2021, the plaintiff was talking to another co-worker, Jordan

Martinus, telling him that the site safety inspector wanted some scaffolding moved if it was not in use, and Martinus told Hamm to "go sit on the safety guy's dick." *Id.* at PageID.361-62.

The plaintiff admitted at his deposition that he did not recall reporting any of the hostile interactions until February of 2021, when he placed a phone call to Construction Manager Chad Ruff and told him about the Kevin Bacon conversation and that co-workers had referred to him using gay slurs. Hamm dep. at PageID.347. Hamm also reported the incident where a phrase was hand scribbled in the dust on his vehicle after work. *Id.* at PageID.361; *see* Photo, ECF No. 23-2, PageID.508. Ruff responded that he "would have a talk with all the guys." *Ibid.* However, Hamm had another conversation with Ruff in March 2021 in which he reported that he was "still being called a faggot" by co-workers. *Id.* at PageID.359. Hamm told Ruff that Brian Martinus, Josh Perez, and Kyle Flaler all had made disparaging remarks. *Ibid.* Ruff responded that he would "take care of it." *Ibid.*

On April 29, 2021, the plaintiff had a workplace confrontation with his site superintendent, Brian Martinus. The plaintiff had arrived at work and was occupied for around an hour tearing down a gunite machine. Hamm dep. at PageID.363. Hamm needed air tool oil to finish the teardown, which he spent some time looking for around the job site with no luck. *Id.* at PageID.363-64. As Hamm approached a doorway he ran into Martinus and Martinus's supervisor, Bob Richmond. Martinus asked "where in the f* are you going," and Hamm said he was looking for air tool oil. Martinus began yelling and said, "Get the fuck out of here and go fuck yourself, faggot." *Id.* at 364. Hamm went to one of the nearby job site trailers and reported the confrontation to work site supervisors Corey Lindros and Vince Bond. *Id.* at PageID.364-65.

The plaintiff subsequently submitted a formal complaint about the April 29 incident through the defendant's HR department, and an investigation was conducted by defendant's Senior

Manager of Human Resources, Grace Jacob.  Jacob took a complaint from Hamm, which related

the incidents cataloged above, in addition to the April 29 confrontation.  Investigation Report dated

Apr. 30, 2021, ECF No. 22-11, PageID.429-30.  Jacob interviewed Martinus, who admitted that

he cursed at the plaintiff and said "go fuck yourself," but claimed that he was responding to the

plaintiff saying that he was going home.  *Id.* at PageID.430-31.  Martinus emphatically denied ever

calling the plaintiff a faggot.  *Id.* at PageID.431.  Jacob also spoke to Bob Richmond, who said

that he witnessed the incident, reporting that Martinus snapped at Hamm after observing that

Hamm was not getting much work done, and that Martinus said to Hamm, "you might as well go

the fuck home."  *Ibid.*

Jacob also documented interviews with six other (unnamed) witnesses from the job site, all

of whom denied ever referring to Hamm with gay slurs or hearing anyone call Hamm a "faggot"

or other disparaging terms.  *Id.* at PageID.431-32.  Some recalled a conversation about Kevin

Bacon that involved Hamm, but they said that the topic was discussed only because Bacon had

been murdered within the past year.  *Id.* at PageID.432.  Jacob concluded that no violation of

Pullman's workplace anti-harassment policy could be substantiated, but she recommended that

company policy should be "reinforced" by requiring all personnel at the job site to participate in

refresher training to reinforce anti-discrimination principles.  *Id.* at PageID.432-33.

On May 3, 2021, Ruff and Jacob called the plaintiff to discuss the investigation and

informed him that Jacob was "unable to substantiate" the complaint of harassment.  Grace Jacob

aff. ¶ 8, ECF No. 22-4, PageID.328.  Hamm requested to be reassigned to a different job site where

he would not have to interact with any of the problematic co-workers; Ruff and Jacob agreed to

the request and said that "Hamm and Ruff would work together" to find a new assignment.  *Ibid.*;

Amend. Compl. ¶ 26, ECF No. 3, PageID.63.  Pullman took corrective action by issuing a written

warning to Brian Martinus for "inappropriate behavior," requiring all Detroit area Pullman work site supervisors to attend in-person anti-harassment training and requiring all Pullman employees to review and sign a copy of the company's anti-discrimination policy.  Grace Jacob aff. ¶ 9, ECF No. 22-4, PageID.328.

After the May 3, 2021 conversation, Ruff granted Hamm's request to take leave until a new assignment could be arranged.  Hamm dep., ECF No. 22-5, PageID.377.  Hamm also submitted doctor's notes indicating that he was unable to return to work due to depression and anxiety, and he was allowed to go on sick leave initially until May 10, 2021.  *Ibid.*  The medical leave later was extended through May 24, 2021.  *See* Doctor's Notes, ECF No. 22-15, 23-4.

Over the course of three weeks in May, while he was still on medical leave, Hamm spoke several times with Ruff about prospective alternative assignments.  During one conversation, Ruff asked, "How does Toledo or Cincinnati sound," and Hamm responded, "Isn't that a bit of a hike," referring to the commute from his home in Howell, Michigan. Hamm dep., ECF No. 22-5, PageID.377-78.  Hamm stated that he "did not decline" a potential offer in Toledo or Cincinnati and insisted that Ruff "never offered" a specific assignment during the exchange.  *Id.* at PageID.378-79.  Hamm also informed Ruff that he would be out on medical leave through May 24, 2021.  *Id.* at PageID.380.  Ruff responded, "lets touch base next week."  *Ibid.*  Ruff later spoke to Hamm and said he was considering placing him on an assignment that would involve working at heights, and Hamm expressed doubts but said that he "would give it a shot"; Hamm insisted again that the assignment was "not declined," and that it was "never offered."  *Id.* at PageID.381. Subsequently, Ruff called Hamm to discuss a potential assignment at a school building project in Grosse Pointe, which Hamm would have to start at 4:00 p.m. the following day.  Hamm said he had a doctor appointment at 3:30 p.m. that day, and Ruff responded, "so that definitely won't

work," following up with, "Let me see what I can figure out," and "there will be something somewhere." *Ibid.* Ruff testified at his deposition that, in any event, when an employee is out on medical leave they cannot return to work until a medical return to work authorization is submitted. Chad Ruff dep., ECF No. 22-8, PageID.409.

On May 18, the plaintiff sent a text message to Ruff informing him that he had been cleared to return to work on May 24, 2021. Ruff texted back, "Try me Friday afternoon bud!" Text Messages, ECF No. 23-6, PageID.548. The plaintiff subsequently texted Ruff on Thursday, Friday and Monday about possible work, but received no response. *Id.* at PageID.549-50. On May 27, 2021, the plaintiff texted Jacob asking about his employment status. Jacob responded that the plaintiff's rejection of several job offers was considered a voluntary resignation, stating:

> Good morning Kevin. From my understanding, you were offered several jobs of which you declined for one reason or another.
>
>   * * *
>
> Pullman employees need to be ready, willing, and able to perform various scopes of work assigned to them. Unfortunately, our employees are not able to choose which scopes they want to work and which they'd rather not. For these reasons, Pullman does not wish to continue the employment relationship. Declining work available to you is considered a voluntary resignation.

Text Messages, ECF No. 23-7, PageID.552-53. The plaintiff replied stating that he had not refused any offers of work, and that he merely explained that some of them would be hard for him to do because of his fear of heights, shoulder pain, or family responsibilities, and he reminded Jacob that he was on medical leave until May 24. *Id.* at PageID.554. Jacob sent no further reply.

The plaintiff attested that since his employment with defendant ended, he applied for three jobs between December 2022 and January 2023, with Lowes, Aldi, and Pepsi. Hamm dep. at PageID.391-92. He did not receive interviews or offers from any of those applications. The plaintiff was placed on the out-of-work list with the Laborer's Union after he stopped working

with the defendant.  He was offered an assignment in May or June 2021, which he declined because he was "still off work for medical."  *Id.* at PageID.386-87.  Sometime in late 2022, the Union placed the plaintiff on a job in Ann Arbor, Michigan, but he left that assignment after one day of work because he "couldn't handle it with [his] anxiety."  *Id.* at PageID.387.  Sometime in 2022 or 2023, the Union offered the plaintiff work on a pipeline job, which the plaintiff declined because "it was long hours" and he "was scared [and] unable to do that job."  *Id.* at PageID.393.  The plaintiff received and accepted a job offer with Barton Malow and began work there in March 2023, but as of the date of his deposition (August 15, 2023) he was on indefinite medical leave due to anxiety and depression.  *Id.* at PageID.394.  The plaintiff did not attest to any other efforts that he made to seek employment between May 2021 and the present.

The plaintiff testified that, after the workplace confrontation with Brian Martinus, he began attending counseling sessions with Dr. Ruth Gibson, at first weekly, and then bi-weekly through the time of his deposition.  Hamm dep. at PageID.389.  The plaintiff attested to feeling anxiety and depression previously during the pandemic, but he could not recall if he previously received psychological counseling or medication, with the exception of attending some "group therapy" around 2004 after he was "hit in the head with a sheet of plywood."  *Ibid.*  He also was treated for suffering sexual molestation during an indefinite time frame in his younger years, and that treatment included taking unspecified medications.  *Id.* at PageID.390.

On June 7, 2022, the plaintiff filed a complaint in the Wayne County, Michigan circuit court.  Defendant Pullman SST, Inc. removed the case to federal court on June 29, 2022.  The plaintiff filed an amended complaint on July 13, 2022 alleging a claim of hostile work environment harassment on the basis of sexual orientation contrary to the Elliot-Larsen Civil Rights Act, (ELCRA) Mich. Comp. Laws § 37.2101 *et seq.* and Title VII of the 1964 Civil Rights Act, 42

U.S.C. § 2000e, *et seq.* (Count I), and retaliation due to his complaint of harassment (Count II). The defendant responded with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which was denied in an opinion issued by Judge George Caram Steeh on November 10, 2022. Following the close of discovery, the defendant filed a motion for summary judgment.  The case was reassigned to this Court after Judge Steeh recused on October 24, 2024.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A.

Pullman argues that the evidence in the record does not support Hamm's hostile work environment claim because the facts do not show jobsite harassment that was so severe or pervasive that it altered the conditions of Hamm's employment, and because the human resources personnel took corrective action, there is no basis to hold it liable for the boorish conduct of its employees. Hamm argues that the evidence substantiates severe and pervasive sexual-orientation harassment, and Pullman's response was inadequate because it could have done more to accommodate his job reassignment requests, or it could have transferred the harassers from the Michigan Central Station jobsite.

"Title VII prohibits employers from 'discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment,' or 'limit[ing] . . . or otherwise adversely affect[ing] [an individual's] status as an employee, because of such individual's . . . sex.'" *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 603 (6th Cir. 2022) (quoting 42 U.S.C. § 2000e-2(a)). "Title VII's prohibition on sex discrimination [] encompass[es] discrimination based upon an employee's sexual orientation." *Ibid.* (citing *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 662 (2020)). The Michigan Elliott–Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et seq.*, prohibits the same conduct. "Cases brought pursuant to the [Elliott–Larsen Civil Rights Act] are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir. 2004).

In order to prevail on a hostile work environment claim under Title VII, the plaintiff must come forth with "facts demonstrating that [his] workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe and pervasive to alter the conditions

of [his] employment and create an abusive working environment.'" *Fedder v. CEMS of Ohio, Inc.*, No. 24-3028, 2024 WL 5319224, at *5 (6th Cir. Nov. 6, 2024) (quoting *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir. 2024)).  The plaintiff also must "demonstrate that the harassment was because of [his] gender or identity," and that the employer "is vicariously liable for the harassment." *Ibid.* (citing *Ogbonna-McGruder*, 91 F.4th at 839; *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)).  "An employer is liable for harassment by a co-worker if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'" *Ibid.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000)).

The plaintiff has failed to substantiate a viable cause of action for hostile work environment harassment based on his sexual orientation, for two reasons.  First, his evidence does not support a finding of sufficiently severe and pervasive hostility.  Second, even if the plaintiff could prove that the work environment was intolerably hostile, it is undisputed that the defendant immediately took corrective action that foreclosed any further exposure to the alleged harassment.

"Courts consider the totality of circumstances in determining the severity and pervasiveness of alleged harassment, including 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Ogbonna-McGruder*, 91 F.4th at 840-41 (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).  In this case, the workplace conduct was not sufficiently severe or pervasive to measure up to the bar for establishing an intolerably hostile environment.  Viewed in the most generous light, the plaintiff's testimony establishes around a dozen incidents over the course of six months in which various co-workers

referred to the plaintiff using insults or insinuations that could be viewed as related to his sexual orientation.  However, the plaintiff has not presented any evidence that any of the encounters involved physical threats or intimidation, and he did not testify that any of the incidents in any way interfered with the performance of his work.  *See Ogbonna-McGruder*, 91 F.4th at 841 ("[The plaintiff did not allege that the harassment was physically threatening [and] [h]er conclusory assertions that defendants' actions 'unreasonably interfered with [her] work performance,' without alleging supporting factual allegations, is insufficient.").  True, there was a reference to a gay man, Kevin Bacon, who was murdered in a sexual-orientation-related hate crime in 2019.  But that conversation never devolved into threats or physical intimidation, and the reference was isolated. Instead, the record here describes conduct that at worst comprises mere offensive utterances, and it is well established that something more is required to establish a hostile environment.  *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 350 (6th Cir. 2020) ("Kheibari conceded that he faced no physical threats, instead facing only some offensive comments.  And this court holds much more aggressive and bigoted conduct as insufficiently severe."); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir. 2014) ("[The] coworkers' comments [about eating watermelon and fried chicken] — were offensive but not particularly serious or threatening; rather, they fall into the 'offensive utterance' category.").

The frequency of the offensive conduct also is not remarkable, comprising only scattered interactions over half a year — around two incidents per month, on average.  The Sixth Circuit has held that such occasional and intermittent episodes do not suffice to demonstrate hostility that was sufficiently pervasive to warrant redress under Title VII.  *Ogbonna-McGruder*, 91 F.4th at 841 ("The district court did not err in concluding that the four alleged incidents fail to establish severe or pervasive harassment.  As an initial matter, those events occurred over a period of approximately

two and a half years — that is too infrequent to demonstrate that her workplace was 'permeated with' ridicule and insult."); *Amini*, 819 F. App'x at 350 ("[T]he number of incidents cited by Kheibari shows only intermittent conduct by Snyder over nine months.  Our court sees worse.  In *Clay v. United Parcel Service, Inc.*, the plaintiff alleged fifteen racially motivated comments and instances of disparate treatment over a two-year period.  Yet we held those acts to be isolated, not pervasive, and thus not actionable under Title VII.") (citing 501 F.3d 695, 707-08 (6th Cir. 2007)).

In sum, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment,'" *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512-13 (6th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), and "[o]ccasional offensive utterances do not rise to the level required to create a hostile work environment," *ibid.* (citing *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)).  "'To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected.'"  *Ibid.* (quoting *Grace*, 521 F.3d at 679).  The plaintiff's evidence certainly describes boorish incivility revealing his coworkers' base instincts.  But it does not rise to the level of actionable hostility under Sixth Circuit law.

When confronting conduct notably more deplorable and intense than that alleged here, the Sixth Circuit has held that the evidence did not suffice to establish a hostile work environment. *E.g.*, *Williams*, 643 F.3d at 513 ("Although despicable, Wingo's alleged racist statements are not sufficiently 'severe' or 'pervasive' standing alone to create a jury question on Williams's racially hostile work environment claim.  The statements were isolated, not pervasive: all but two occurred over a two-day period.  Nor were they sufficiently 'severe' for Williams to be able to prevail on a racially hostile work environment claim.  Those statements — for example, calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should 'go back to where [they] came

from' — are certainly insensitive, ignorant, and bigoted.  But they more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating.'") (citing *Harris*, 510 U.S. at 21 ("[M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.") (cleaned up)). The plaintiff's record here does not demonstrate incidents that measure up either in severity or frequency, and aggravators such as physical intimidation and interference with work duties have not been shown.  *C.f. Johnson v. Ford Motor Co.*, 13 F.4th 493, 506 (6th Cir. 2021) ("The district court also failed to account for the fact that these comments and messages were not mere offensive utterances but rather they were physically threatening or humiliating.  As Johnson testified at deposition and included in her declaration, many of Rowan's harassing comments constituted specific demands to see or receive pictures of Johnson's breasts or vagina, infused with references to Johnson's race.")

Second, even if the plaintiff could establish the existence of a sufficiently hostile environment, he cannot prevail on the second element of his hostile environment claim, which requires him to show that the defendant failed to take prompt corrective action.  Once an employer learns of (or should have discovered) the sexual harassment, the law requires that it "implement prompt and appropriate corrective action."  *Pierce*, 40 F.3d at 804, *abrogated on other grounds by Reeves*, 530 U.S. 133.  The defendant contends that its HR investigator was not aware of all the alleged incidents of harassment, because the plaintiff did not recount all of them in his April 30, 2021 interview with Grace Jacobs.  However, the plaintiff testified that he reported earlier incidents to his supervisor, Chad Ruff, on several occasions over the relevant span of time, so there are lingering questions of fact about the extent of knowledge that may be imputed to the defendant.

- 13 -

Regardless, it is undisputed that, upon receiving the plaintiff's April 29, 2021 complaint, the defendant's HR representative took immediate corrective action by conducting an investigation and interviewing nine witnesses including those involved in all of the alleged incidents of offensive conduct. Even though Jacobs concluded that the plaintiff's complaint of harassment could not be substantiated, the defendant still took corrective action by distributing and requiring employees to acknowledge a copy of its anti-harassment policy, and by mandating a round of in-person refresher training on workplace discrimination for all site supervisors. Moreover, the defendant granted the plaintiff's request to be reassigned away from the Central Station job site, so that he would not have to encounter any of the problematic co-workers. It is undisputed that the plaintiff did not suffer further harassment from anyone after April 30, 2021.

Where there is no dispute that a defendant acted promptly by taking corrective action that ends harassment, such a showing is fatal to the Title VII hostile work environment claim. *Courtney v. Landair Transp., Inc.*, 227 F.3d 559, 565 (6th Cir. 2000) ("It was not until December 4, 1996, when defendant received the lawyer's letter asking defendant to stop the harassment, that defendant had notice of the harassment. That same day defendant telephoned plaintiff to discuss her complaints and sent a letter to her detailing their conversation. It was at this point that defendant issued the memorandum to all owner-operators reemphasizing Landair's anti-harassment policy. With this action, the record shows that all harassment ceased. We agree with the court below that, taking the evidence in the light most favorable to plaintiff, the defendant's conduct was not negligent or indifferent to plaintiff's situation."); *see also McMillin v. Lowe's Home Centers, LLC*, No. 22-00294, 2024 WL 2141947, at *8 (M.D. Tenn. May 13, 2024), *R&R adopted*, 2024 WL 4093905 (M.D. Tenn. Sept. 5, 2024) ("After an investigation, Lowe's concluded that Weems had not sexually harassed McMillin. However, Lowe's issued Weems a

Final Warning to refrain from hugging or inappropriately touching other associates, customers, vendors, and suppliers.  Weems heeded the warning, and as McMillin testified, Weems did not engage in any further purported harassing behaviors after November 6, 2020.  The undisputed evidence shows that Lowe's actions immediately ended the alleged harassment, and therefore Lowe's has satisfied its obligations under Title VII.") (citing *Courtney*, 227 F.3d at 565).

The plaintiff has not produced evidence that creates a fact question on two of the essential elements of his hostile work environment claim.  Count I of his amended complaint therefore will be dismissed.

## B.

Pullman argues that the record does not support Hamm's retaliation claim because it never took adverse action against him, the work conditions were not so intolerable as to establish a constructive discharge, Hamm abandoned his job when he did not accept the alternate employment Pullman offered, and there is no evidence of a causal link between the acknowledged protected conduct and Hamm's termination.  Hamm responds that the stated basis for termination was pretextual because the alternative job assignments were extended while the plaintiff was out on medical leave and before he was approved to return to work, and the reassignment offers were themselves "disadvantageous changes" in his work situation amounting to adverse actions, because they represented deviations from the work situation to which he had become accustomed.

Federal courts "evaluate Title VII retaliation claims with the well-established *McDonnell Douglas* burden shifting test."  *Huang v. Ohio State Univ.*, 116 F.4th 541, 561 (6th Cir. 2024) (citing *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019)).  "Under that framework, [the plaintiff] must first make a *prima facie* case by showing (1) [he] engaged in a Title VII protected activity, (2) [his] employer knew about it, and (3) [his] employer took an

adverse employment action against [him] because of [the] protected activity." *Ibid.* (citing *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021)).   If the plaintiff makes a *prima facie* showing, then the defendant will have the opportunity "to assert a nondiscriminatory reason for its actions," and to defeat such a defense the plaintiff "would have to show pretext." *Ibid.* (citing *Redlin*, 921 F.3d at 613-14).

The plaintiff cannot prevail on his retaliation claim because, even if he has made out a viable *prima facie* case, he has not presented sufficient evidence to rebut the defendant's proffered legitimate non-discriminatory ground for termination based on the plaintiff's refusal of several alternative work assignments.

"Typically, a plaintiff may establish pretext by proving that an employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the adverse employment action or (3) are insufficient to motivate discharge." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).   "But these are not the only ways that a plaintiff can establish pretext[.]" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).   These three evidentiary paths have been described as "merely 'a convenient way' to answer the 'ultimate inquiry: "did the employer fire the employee for the stated reason or not?"'" *Campbell-Jackson v. State Farm Ins.*, No. 23-1834, 2024 WL 4903807, at *8 (6th Cir. Nov. 27, 2024) (quoting *Tingle v. Arbors at Hillard*, 692 F.3d 523, 530 (6th Cir. 2012)).   "To answer this question, a plaintiff need only present 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired h[im].'" *Ibid.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).   "This burden is not heavy." *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020).

The parties do not dispute the first two elements of the *prima facie* case.   The plaintiff complained several times to his supervisor about the alleged hostility, and he initiated a formal

complaint of harassment with the defendant's HR department on April 29, 2021. "[C]omplaining about allegedly unlawful conduct to company management is classic opposition activity," *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012), and the plaintiff testified that Ruff and Jacobs were aware of all the alleged incidents of harassment.

The parties disagree on the third element, which requires the plaintiff to show that he suffered an adverse action, and they debate whether the plaintiff was terminated or "voluntarily resigned" from his position. However, there is a question of fact about whether the plaintiff was terminated, since Jacobs's statement on May 27, 2021 that "Pullman does not wish to continue the employment relationship" based on the plaintiff's refusal of work assignments reasonably could be read by a jury as a decision to terminate the employment relationship despite the plaintiff's communication that he was ready to resume work. It is axiomatic that termination of employment constitutes an "adverse action" for the purpose of a Title VII retaliation claim. *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 900 (6th Cir. 2024).

The parties also debate causation, and the defendant insists that the plaintiff cannot prevail on that element because the breakdown of negotiations over alternative work assignments was an "intervening cause" for the cessation of his employment. "To show causation, a plaintiff must [prove] that the defendant would not have taken the adverse action 'absent the retaliatory motive.'" *Susselman v. Washtenaw County Sheriff's Office*, 109 F.4th 864, 871 (6th Cir. 2024) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019)). "'Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation.'" *Campbell-Jackson v. State Farm Ins.*, No. 23-1834, 2024 WL 4903807, at *7 (6th Cir. Nov. 27, 2024) (quoting *Mickey v. Zeidler Tool*

& *Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). "'In such cases, the adverse employment action is often taken just days or weeks from when the employer learns of the employee's protected activity.'" *George*, 966 F.3d at 460.  Here, it is undisputed that the termination occurred within weeks of the plaintiff's submission of his formal harassment complaint, which is close enough to pass muster at the *prima facie* stage.

The difficulty for the plaintiff, however, is that he has not presented sufficient evidence to establish that the stated grounds for his termination were pretextual, that is, "evidence from which a jury could reasonably reject [the employer's] explanation of why it fired h[im].'" *Campbell-Jackson*, 2024 WL 4903807, at \*8.  The plaintiff has offered no evidence here to rebut the defendant's proofs that he was terminated for refusal to accept several new work assignments on grounds entirely unrelated to either the alleged harassment or the plaintiff's medical leave.

Ruff attested that when he offered Hamm a job in Toledo, Hamm refused because it was too far to drive, being a 60-to-90-minute drive each way.  Chad Ruff aff. ¶ 11, ECF No. 22-3, PageID.321.  However, Ruff said that it is common for laborers in the industry to commute up to 100 miles per day for jobs.  *Ibid.*  Hamm admitted that he had driven a similar distance for other assignments.  Hamm dep., ECF No. 22-5, PageID.378-79.  Ruff also offered Hamm "overhead demo" work, but Hamm declined because the work would "hurt his shoulders."  Ruff aff. ¶ 12. Ruff next offered Hamm a job doing caulking work at Hart Plaza, which was located within minutes of the Detroit Central Station job site where plaintiff previously was assigned, but Hamm declined due to the extension of his medical leave.  *Id.* ¶ 13, PageID.322.  Ruff stated that he "was not aware that [Hamm] had asked to extend his medical leave for another week when I offered him the Hart Plaza job, but told him that was fine, and that [he] would be in touch with any jobs available for the week he returned from medical leave."  *Ibid.*  In mid-May, Ruff offered Hamm a

caulking job at a nearby worksite in Great Lakes, which Hamm declined due to his "fear of heights." *Id.* ¶ 14.  Finally, Ruff offered Hamm a job doing second shift masonry work, starting at 4:00 p.m. the next day, but Hamm declined because he had a doctor appointment at 3:30 p.m., and Ruff said that "Hamm did not offer to move his appointment." *Id.* ¶ 15.  Ruff summed up by attesting that "despite telling me that he was ready to return to work starting on May 10, [Hamm] submitted several requests to extend his medical leave throughout May, which prevented him from being available for various assignments," and that he "offered Hamm every available job opportunity in the area that accommodated his various restrictions, but he rejected every one of them." *Id.* ¶ 17.  Hamm admitted at his deposition that he did not know of any other available assignments that Ruff did not offer him.  Hamm dep. at PageID.383.

Hamm's testimony about the interactions with Ruff is consistent with Ruff's narrative, and Hamm does not dispute the particulars of his objections to the proposed reassignments.  Out of the five alternatives suggested by Ruff over several weeks in May, Hamm declined only one explicitly due to his ongoing medical leave.  He objected to the other four assignments for reasons entirely unrelated to his mental health or ongoing medical leave; there is no basis in this record to suggest that his objections due to "fear of heights," "shoulder pain," or excessive commute time would differ after he was approved to return to work.

Hamm minces words insisting that the assignments were "never offered" and "never declined," but it is plain from both Hamm's and Ruff's accounts that Hamm's objections ended the discussion on each occasion when a new assignment was proposed.  Whether Hamm's objections are viewed as "rejecting" offers or simply prompted Ruff to forego "offering" assignments is immaterial; either way, it is undisputed that Hamm made clear his distaste for the proposed assignments on various grounds, which Ruff reasonably interpreted as indications that

further discussions would be futile.  The plaintiff says that Ruff never made him any "realistic" offers of alternative assignments, but Ruff says he offered every assignment that he had available, and the plaintiff found each offer unsuitable.  The plaintiff admitted that he could not identify any other assignments that were available in the relevant time frame and not offered to him by Ruff.

The plaintiff also maintains that no assignments were offered when he finally was ready to return to work.  The plaintiff submitted a doctor's note that stated he would be ready to return to work without restrictions on May 10, 2021, which was around the time Hamm had his first conversation with Chad Ruff about a job in Toledo, Ohio.  *See* Pl.'s Resp. to Mot. For Summ. J., Ex. A, ECF No. 24-2, PageID.569; Pl's dep., ECF. No. 22-5, PageID.376-79.  Later, he submitted two other doctor's notes, each extending his return-to-work date by one week each, the last one to May 24, 2021.  Pl.'s Resp. to Mot. For Summ. J., Ex. A, ECF No. 24-2, PageID.570-71.  But the undisputed record demonstrates that Ruff suggested several assignments to Hamm in anticipation of his return to work without restrictions.  It is reasonable to conclude that the plaintiff's serial refusals, or at least discouraging rejoinders, would dampen his supervisor's enthusiasm for continued job offers.  In all events, the cessation of assignment offers after five tries and five rejections can hardly be seen as a pretext for retaliation.

The plaintiff has not presented any evidence suggesting that the proposed assignments were far afield from the mine run of jobs typically performed by construction laborers.  He argues nevertheless that the grounds for termination were insincere or fabricated.  "This method [of showing pretext] is 'essentially an attack on the credibility of the employer's proffered reason and consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason.'"  *Morgan v. Interstate Res., Inc.*, No. 23-3866, 2024 WL 3221394, at *4 (6th Cir. June 28, 2024) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d

- 20 -

274, 285 (6th Cir. 2012)).  "But if 'the employer can demonstrate an honest belief in its proffered reason,' meaning that it 'reasonably relied on particularized facts that were before it at the time the decision was made,' then no inference of pretext is warranted." *Ibid.*  And where a plaintiff "offers nothing other than his own testimony to prove [pretext] his 'bare assertion that [the defendant's] proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.'"  *Ibid.*  The plaintiff has offered nothing more here, because he has presented no evidence that serial refusals of work assignments due to physical limitations, phobias, and excess commute time did not comprise valid reasons on which the defendant reasonably and legitimately relied when it decided that the plaintiff was unsuitable to continue employment in the usual course of business as a construction laborer.

The plaintiff also argues that the proposed reassignments themselves would have represented "adverse actions" even if he had accepted them, citing *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024) ("[The complaining] transferee does not have to show . . . that the harm incurred was 'significant' [or] serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.").  This argument appears to be aimed at both sustaining the *prima facie* case and furthering a rebuttal of the defendant's legitimate non-discriminatory reason for the termination.  It is not necessary to decide whether the proposed reassignments in themselves would suffice to show an adverse action, since, as noted above, the plaintiff's record supports a factual dispute about whether he was terminated, and termination unquestionably would suffice to satisfy the adverse action element.

Moreover, the *Muldrow* court acknowledged that, although there is no particular threshold of "significance" that a plaintiff must prove, he still must show that a transfer was *disadvantageous* in some way.  *Id.* at 354.  The plaintiff has not presented evidence of any "disadvantageous" aspects

in several of the proposed assignments.  One of the job sites was within minutes of the plaintiff's former assigned posting.  Another was within the commuting range that the plaintiff acknowledged as acceptable for other, prior assignments.  The plaintiff points to no "disadvantage" at all from a third assignment other than a start time that conflicted with a scheduled medical appointment.  The plaintiff objected to two proposals due to physical discomfort and fear of heights, but he has not shown that the work proposed was unusual or atypical for construction laborers or unlike work he had done in the past.

Finally, *Muldrow* is distinguishable because that case involved a compelled reassignment at the employer's initiative, and here it is undisputed that the attempted reassignment was undertaken *at the plaintiff's request*, because he asked to be reassigned away from the Central Station job site after Jacobs found that his complaint of unlawful harassment could not be substantiated.  At oral argument, plaintiff's counsel insisted that the plaintiff never requested reassignment and would have preferred that his employer transfer all the other workers at the Detroit Terminal site and allow him to stay there.  But that argument is undermined by the allegation in the amended complaint that "he wanted to be re-assigned," Amend. Compl ¶ 26, ECF No. 3, PageID.63, albeit to avoid working with that crew.  And because the employer's reasonable investigation could not substantiate the harassment allegations, it had no obligation to resort to the drastic action of swapping out an entire crew.

The plaintiff made the request for immediate reassignment despite the corrective actions undertaken, without waiting to see if they would end the harassing conduct.  As discussed above, the plaintiff has failed to show that any legally actionable hostility occurred, and he has cited no legal authority holding that an employer is obligated, in the absence of an unlawfully hostile workplace climate, to indulge an employee's request for reassignment to work suited in every

particular to his desires.  *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300-01 (11th Cir. 2007) ("An offer to transfer an employee . . . is not an employment action; it is merely an offer.  Providing an employee with a choice about where she works does not change the terms or conditions of her employment. . . . Firing an employee because she will not cooperate with the employer's reasonable efforts to resolve her complaints is not discrimination based on sex, even if the complaints are about sex discrimination.  Were it otherwise, an employee would be free to refuse any reasonable remedy the employer offered to resolve her complaint.").

The plaintiff has made out a *prima facie* case for retaliation, but he has not presented sufficient evidence to rebut the defendant's legitimate reason for termination based on the serial refusal of alternative work assignments on various grounds.  The defendant has shown that it is entitled to judgment as a matter of law on the retaliation claim.  Count II of the amended complaint will be dismissed.

III.

The plaintiff has not produced sufficient evidence to establish material questions of fact on all the elements of his claims.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 22) is **GRANTED**.

It is further **ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 12, 2025